IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JACOB ALLEN WOOD, | ) | |
|     Plaintiff, | ) | Civil Action No. 7:20-cv-00719 |
| | ) | |
| v. | ) | |
| | ) | By: Elizabeth Dillon |
| DR. JOSEPH CUTCHIN, JR., | ) |     United States District Judge |
|     Defendant. | ) | |

**MEMORANDUM OPINION**

Jacob Allen Wood, a Virginia inmate proceeding *pro se*, commenced this civil action under 42 U.S.C. § 1983. Left in the case are Wood's claims against a single defendant—Dr. Joseph Cutchin, Jr., who treated Wood while he was incarcerated at the Southwest Virginia Jail Authority's Abingdon facility ("the Jail"). Wood alleges that Dr. Cutchin, a physician who provided medical services to inmates at the Jail, violated Wood's Eighth Amendment rights. Specifically, he contends that Dr. Cutchin failed to properly manage his Hepatitis C virus ("HCV") and failed to prescribe Direct Acting Antivirals ("DAAs"), a type of drug that became available in 2015 and is highly effective at curing HCV.

Pending before the court is Dr. Cutchin's motion for summary judgment (Dkt. No. 42), which is fully briefed and ripe for disposition. For the reasons set forth herein, the motion for summary judgment will be granted.

I.     BACKGROUND

The summary judgment record includes an affidavit from Dr. Cutchin, as well as copies of Wood's medical records. The records reflect that Wood arrived at the Jail in August 2019 and his medical screening indicated a history of Hepatitis C. Dr. Cutchin explains that "this history alone does not require intervention as the mere existence of a *history* of Hepatitis C does not call

for a full medical work up.  This viral illness can often be of short duration (weeks) and self-limiting, requiring no further intervention." (Cutchin Aff. ¶ 5, Dkt. No. 43-3.)

For approximately fourteen months after his arrival, Wood requested to be seen for a "variety of medical issues," but the first time he voiced any issues related to Hepatitis C was on October 16, 2020.  "At no time" before that date "did he ever raise any concerns, complaints, or describe any symptoms related to Hepatitis C."  (*Id.* ¶¶ 6-7 (listing all of his medical requests and medical treatment during those fourteen months); *see generally* Cutchin Aff., Ex. A (medical records).)  Wood admits in his response that he did not complain about the symptoms of his HCV until October 2020—more than a year after he arrived at the Jail.  (Resp. in Opp'n to Mot. Summ. J. ("Opp'n") 5, 7–8, Dkt. No. 61.)

Upon that first report that Wood was experiencing symptoms, Dr. Cutchin's "treatment plan began with obtaining various lab studies."  The labs were drawn by October 21, 2020.  (Cutchin Aff. ¶ 8.)  Shortly thereafter, Wood began complaining that "nothing was being done to treat his Hepatitis C" and began asking for a specific test, a fibroscan.  According to Dr. Cutchin, "based on the lab results obtained, [he] felt the appropriate course of action was to obtain an additional evaluative laboratory study."  So, on November 3, he ordered a "special test called a Hepatitis RNA qualitative screening," which is designed to "assess the viral load and determine whether or not [Wood] actually needed treatment."  (*Id.* ¶ 9.)

Wood continued to complain that he was not receiving treatment, and, according to Wood, Dr. Cutchin told him he would not be getting a fibroscan.  Dr. Cutchin denies making that statement and explains that what he "actually told [Wood] was that we needed to have various pieces of diagnostic information *before* a determination could be made on the need for a fibroscan."  (*Id.* ¶ 10.)

Dr. Cutchin ordered the fibroscan after receiving and reviewing all of the lab studies, and Wood was taken offsite to obtain the scan on January 18, 2021. (*Id.* ¶ 11.) "[B]ased on the fibroscan results, and in order to prepare for possible treatment, [Dr. Cutchin] ordered additional lab studies so that an outside referral could be made and so that the outside provider would have the most current value in hand when evaluating" Wood. (*Id.* ¶ 12.) Dr. Cutchin referred Wood to an outside provider to begin treatment on February 22, 2021. On March 8, 2021, Dr. Cutchin advised Wood that he was waiting for the approval for him to be seen by the outside gastroenterologist. (*Id.* ¶ 13.) Then, on April 16, 2021, Dr. Cutchin "became aware that Wood had begun seeing a gastroenterologist and that Hepatitis treatment was to begin upon receipt of recommended medication." (*Id.* ¶ 14.)

Dr. Cutchin retired on June 4, 2021, and Wood was transferred to the custody of the Virginia Department of Corrections on July 21, 2021.[1] Wood avers that he did not receive DAAs at any point while at the Jail.[2] Regardless, after Dr. Cutchin retired on June 4, he had no additional interactions with Wood and cannot be held responsible for any failure to treat Wood after that date.

Summarizing, then, after Wood first complained in October 2020, Dr. Cutchin ordered the first test within a week, and several other tests over the course of four months, including a fibroscan that was done off-site. After those test results had been received and reviewed, Dr. Cutchin referred Wood to an outside provider for treatment, approximately four months after the first report of symptoms. Then, there was a period of less than two months (from the end of

---

[1] As a result of his transfer, Wood's requests for injunctive relief are moot.

[2] Other documents in the case, submitted as part of another defendant's summary judgment motion, explain that Wood was referred for HCV treatment immediately after being transferred into VDOC custody in July 2021. No party has explained whether Wood received DAAs or other treatment after his transfer to VDOC custody or whether his HCV has since been cured, and the medical records from his time in VDOC are not part of the record.

3

February until early April) where Dr. Cutchin had requested treatment, but none was being provided and that fact was known to Dr. Cutchin. Thereafter, Dr. Cutchin believed Wood was receiving treatment, but there was another two months from then until Dr. Cutchin's retirement, when Wood states that he had not yet started receiving DAAs.[3]

There is no explanation in the record for the delay from February 2021, when Dr. Cutchin referred him for outside treatment, through Dr. Cutchin's retirement (or Wood's transfer in July), and no medical records for the Jail have been provided after March 8, 2021, by either party. It appears that Dr. Cutchin submitted a form requesting authorization to have Wood treated on February 22, 2021. (Dkt. No. 43-2, at 11.) Thereafter, it appears that additional information was requested and provided, but the medical records do not reflect whether approval ultimately was provided and, if so, when. (*See id.*)

Dr. Cutchin denies that he ignored Wood's needs or was deliberately indifferent, and he emphasizes that he instituted a diagnostic plan as soon as Wood indicated he was having symptoms that he attributed to Hepatitis C. In addition to providing "timely and reasonable" care for Wood's other medical issues, Dr. Cutchin submits that he cared for Wood's Hepatitis C by examining him, ordering various laboratory studies and diagnostic tests, making changes in treatment plans based on the results of those tests, and ordering a consult with a specialist.

With his opposition, Wood has provided an affidavit and many pages of exhibits, which the court has reviewed. Most of Wood's exhibits relate to care he received prior to his incarceration, such as at Johnston Memorial Hospital in 2015, or are general medical literature

---

[3] Dr. Cutchin states that he had been advised, as of April 2021, that Wood was receiving treatment from an outside provider. For his part, Wood denies that he received any treatment (at least in the form of DAAs) while at the Jail, but he does not dispute that Dr. Cutchin had been advised that he was receiving treatment. Thus, for purposes of summary judgment, the court credits Wood's assertion that he did not receive any care (at least in the form of DAAs) from an outside provider at any point before Dr. Cutchin's retirement in early June or while at the Jail. The court also credits Dr. Cutchin's undisputed testimony that the believed, perhaps mistakenly, that Wood was receiving outside treatment as of April.

4

regarding Hepatitis C. His exhibits also include some of his requests for treatment, beginning in October and November.

One exhibit, in particular, warrants discussion. Specifically, on one of his medical grievances, in November 2020, he stated that Dr. Cutchin told him that his enzyme levels were normal and that he would not be treated because treatments are expensive. (Opp'n Ex. 2 at 6, Dkt. No. 61-2, at 11.) Someone responded to his grievance by saying, "The guidelines were explained to you. You do not qualify for this treatment." (*Id.*) Wood appealed that grievance, and on appeal, he received a nearly identical response: "The guidelines were explained to you and you do not meet them." (*Id.*)

Although Dr. Cutchin filed a reply, he did not expressly address those grievance responses. Instead, he argues generally that many of Wood's statements are unsubstantiated and conclusory claims without evidentiary support. As an example, Dr. Cutchin explains that Wood's "claims of what Dr. Cutchin said to him . . . are nothing but accusations in a vacuum, unsubstantiated, and not corroborated by any evidence." (*See* Reply 3, Dkt. No. 65.) And, as noted, Dr. Cutchin denies telling Wood that he would not ever receive a fibroscan or that he would not be treated.

II. DISCUSSION

A. Summary Judgment Standard

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the nonmoving party. *Ricci v. DeStefano*, 557 U.S.

557, 586 (2009).[4] In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48. Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 930 (4th Cir. 1990).

**B. Eighth Amendment Claim**

"It is beyond debate that a prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019). To show a violation of his Eighth Amendment rights, an inmate must show that (1) he has "serious medical need," which is a medical condition that has been "diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention" and (2) the defendant "had actual knowledge of the plaintiff's serious medical needs and the related risks, but nevertheless disregarded them." *Id.* at 356–57; *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *see also Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (explaining that the requirement that a particular medical need be "serious" stems from the fact that "society does not expect that prisoners will have unqualified access to health care"). The first component is an objective inquiry, and the second

---

[4] Internal citations, alterations, and quotation marks are omitted throughout this opinion, unless otherwise noted. *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

6

is subjective. *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209–10 (4th Cir. 2017).

To establish deliberate indifference, a plaintiff must present facts to demonstrate that the defendant had actual knowledge of an objectively serious medical need and disregarded that need. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Rish v. Johnson*, 131 F.3d 1092, 1096 (4th Cir. 1997). "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106. Instead, to qualify as deliberate indifference, the defendant's conduct must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837.

A delay in medical treatment may constitute deliberate indifference. *See Smith v. Smith*, 589 F.3d 736, 739 (4th Cir. 2009). Where a prisoner's claim is based on a delay in treatment, though, he must also show that the delay caused him to suffer "substantial harm." *Webb v. Hamidullah*, 281 F. App'x 159, 166 (4th Cir. 2008). *See also Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018) (explaining that where a claim is based not on a denial of medical care, but a claim that the care has been delayed, "we have ruled that there is no Eighth Amendment violation unless "the delay *results* in some substantial harm to the patient," such as a "marked" exacerbation of the prisoner's medical condition or "frequent complaints of severe pain") (citing *Webb*, 281 F. App'x at 166-67 and *Sharpe v. S.C. Dep't of Corr.*, 621 F. App'x 732, 734 (4th Cir. 2015)). The *Formica* court recognized that *Webb* and *Sharpe* were both unpublished decisions but noted that they but nonetheless "consistent . . . with the precedent of other courts of appeals." *Formica*, 739 F. App'x at 755 (citations omitted)

Dr. Cutchin does not dispute that Wood's Hepatitis C is a "serious medical condition" and thus satisfies the objective prong of the constitutional analysis. (Mem. Supp. Mot. Summ. J.

7

11, Dkt. No. 43.) But he contends that Wood has not presented sufficient facts from which a factfinder could conclude that Dr. Cutchin was deliberately indifferent. The court agrees.

Although Wood summarily asserts that Dr. Cutchin failed to treat him for Hepatitis C, Wood's medical records—the accuracy of which he has not disputed—reflect that Dr. Cutchin promptly ordered various diagnostic tests for Wood. Wood clearly disagrees with the course of treatment and seems to believe that Dr. Cutchin should have referred him immediately for the fibroscan and that he should have received an outside referral sooner or immediately been treated with DAAs. But disagreements over the course of medical treatment, or the proper type of medical treatment, do not rise to the level of a constitutional violation. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985).

Wood's overarching contention in response is that his "HCV and its symptoms were merely assessed and monitored, which does not equate to meaningful treatment. Nothing was done by [Dr. Cutchin] to relieve Wood of the physical, mental, and emotional turmoil he was enduring as a result of HCV or the torture that Wood was experiencing as a result of HCV's symptoms." (Opp'n 8–9.) He contends that Dr. Cutchin was made aware of the painful and uncomfortable symptoms of his HCV, including extreme tiredness, abdominal pain, nausea, and joint pain, but that he did nothing to treat the pain and made him wait months to get the fibroscan. Moreover, even after the fibroscan test was done, Wood did not receive any DAAs while incarcerated at the Jail for months afterward. (*Id.*)

For several reasons, the court finds Wood's reasoning unpersuasive. First, it is not accurate that Dr. Cutchin was merely monitoring Wood; he was having him assessed and tested to determine whether Wood needed additional treatment for his Hepatitis C. Second, Wood requested a fibroscan and DAAs, but he does not point to any evidence that he asked for interim

8

medication to treat other symptoms. Moreover, his medical records reflect that, while assessing him for HCV treatment, Dr. Cutchin and other medical providers at the Jail were providing him medications to treat other conditions that he raised and doing so in a timely fashion. The record simply does not reflect that Dr. Cutchin's conduct was so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. *See Miltier*, 896 F.2d at 851.

Wood also relies heavily on the grievance responses in November 2020, which suggest that a set of "treatment guidelines" was being followed and that he did not "qualify" for treatment, at least as of that date. And he points to Dr. Cutchin's alleged statements that he would not get a fibroscan and that treatment was too expensive. But Dr. Cutchin has explained why, in his medical opinion, the additional testing was necessary and appropriate to determine whether Wood, in fact, needed treatment and if so, the appropriate type of treatment. Thus, this case is factually distinguishable from many of the cases on which Wood relies, including *Reid v. Clarke*, No. 7:16-CV-00547, 2018 WL 3626122 (W.D. Va. July 30, 2018), and *Abu-Jamal v. Wetzel*, No. 3:16-cv-2000, 2017 WL 34700 (M.D. Pa. Jan. 3, 2017).

*Reid* and *Abu-Jamal* addressed claims where a plaintiff's HCV was left untreated for years, based on a prison policy that only provided treatment to those inmates who were the sickest. In *Reid*, for example, one of the defendants had previously approved the plaintiff for HCV treatment, which he received and which was unsuccessful. Later, the prison physician told the plaintiff that he "would approve treatment," but the health administrator made the final decision and denied him treatment, relying on the prison's policy to conclude that plaintiff did not meet the guideline criteria. *Reid*, 2018 WL 3626122, at *2. Similarly, in *Abu-Jamal*, the court granted plaintiff's motion for preliminary injunction after concluding that he had a

9

reasonable likelihood of success on the merits and would be harmed by the continued denial of treatment for his HCV. *Abu-Jamal*, 2017 WL 34700, at *15–16. There, the court noted expert testimony that plaintiff had "some liver damage" and that there was no medical exclusion prohibiting him from receiving DAA medications. He was nonetheless denied those medications for years pursuant to a department of corrections policy that only treated inmates after their conditions deteriorated significantly. *Id.*

What occurred in those two cases, however, is not what occurred here. Despite the initial comments in some grievance responses that he did not "qualify" for treatment, Dr. Cutchin evaluated Wood by having appropriate medical testing done and determined that he *should* receive treatment. Wood was approved for outside treatment within four months of his first complaint, although he did not receive it for some period of months afterward. So, those cases do not help Wood.

Moreover, and regardless of what the grievance responses said or even what Wood alleges Dr. Cutchin said,[5] what Dr. Cutchin actually *did* was to order tests, including the fibroscan Wood sought, and to refer him for outside treatment.

In his opposition, Wood also maintains that "continually assessing and monitoring a prisoner's condition does not excuse the failure to provide treatment when treatment is needed." (Opp'n 24 (citing *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005)). *Greeno*, however, is factually and legally distinguishable. There, and unbeknownst to him and his medical providers, the plaintiff had an esophageal ulcer. He repeatedly complained about symptoms regarding his condition, including severe heartburn and frequent vomiting, and he asked to be referred to an

---

[5] As noted in discussing the facts, Dr. Cutchin denied ever having told Wood that he would not receive a fibroscan or that he would not receive treatment. For purposes of summary judgment, though, the court must construe the facts in a light most favorable to Wood, and so the court concludes that, in November 2020, he was told he did not qualify for treatment for his HCV.

outside specialist. The medical defendants treated him instead with Maalox, which he repeatedly told them he was using in large quantities and it was not helping. This continued for two years, until they finally referred him for an endoscopy that diagnosed the ulcer. *Greeno*, 414 F.3d at 649–51.

The court held that summary judgment was inappropriate for defendants because deliberate indifference can be shown be giving treatment that is "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate" his condition. *Id.* at 654 (citation omitted). Those facts are a far cry from the facts here, where Wood was evaluated over a period of four months and then referred for treatment. This was not a case where some treatment was tried unsuccessfully, and the medical providers ignored the prisoner's complaints that the treatment was not working. Thus, *Greeno* does not help Wood.

Lastly, although Wood complains of delays, the record reflects that Dr. Cutchin acted promptly in obtaining what he deemed to be necessary testing. First, within a week of when Wood first raised a complaint about his Hepatitis C, Dr. Cutchin ordered lab work. Over the next four months, Dr. Cutchin was ordering and obtaining lab results to verify that Wood qualified for treatment, which included a fibroscan conducted by an outside provider. Then in February, approximately four months after the first complaint, Dr. Cutchin requested authorization to refer Wood to an outside provider for treatment, and two months after that, Dr. Cutchin was advised that Wood was receiving treatment. Because testing, which Dr. Cutchin has deemed necessary in his medical opinion, was occurring during most of that time, the court simply cannot find that any delay in treatment reflects deliberate indifference on Dr. Cutchin's part.

As noted, it is unclear what caused the additional delay in his receiving treatment, but

having to wait two months to be seen and treated by an outside provider (from February until April, when Dr. Cutchin believed Wood had begun treatment)) is not an unusual period of time, even for persons who are not incarcerated. And Wood has not identified anything that Dr. Cutchin could have done or should have done, either in March, April, or May (before he retired on June 4), to cause the outside provider to treat Wood sooner or to give him DAAs sooner. In short, those delays do not rise to the level of an Eighth Amendment violation.

Other recent cases addressing similar allegations have reached the same conclusion. *E.g.*, *Hinton v. Amonette*, No. 3:18CV59, 2021 WL 279238, at *8 (E.D. Va. Jan. 27, 2021) (granting summary judgment for prison care coordinator who approved plaintiff for outside Hepatitis C treatment, even though it took more than six months from the time of approval until the care was coordinated and plaintiff began receiving DAAs); *see also Insco v. Wexford Health Sources, Inc.*, No. 2:19-CV-00612, 2021 WL 4782273, at *5 (S.D.W. Va. Oct. 13, 2021) (granting summary judgment for medical defendants where they monitored plaintiff's lab results for almost two years, rather than immediately putting him on a regimen of DAA drugs).

For all of these reasons, the court concludes that no reasonable fact-finder could find that Dr. Cutchin's actions exhibited deliberate indifference toward Wood's Hepatitis C or violated Wood's Eighth Amendment rights. Summary judgment in Dr. Cutchin's favor is appropriate.

## III.  CONCLUSION

For the foregoing reasons, Dr. Cutchin's motion for summary judgment (Dkt. No. 42) will be GRANTED, and all claims against him will be dismissed.  An appropriate order will be entered.

Entered: March 17, 2022.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
United States District Judge